## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| **CINDY R. MILLER, M.D.,** | : | |
| | : | **CIVIL ACTION NO.:** |
| **Plaintiff,** | : | |
| | : | **3:18-cv-1872  (JCH)** |
| **v.** | : | |
| | : | |
| **YALE UNIVERSITY, YALE-NEW** | : | |
| **HAVEN HEALTH SERVICES** | : | |
| **CORPORATION, and YALE-NEW** | : | |
| **HAVEN HOSPITAL,** | : | |
| | : | |
| **Defendants.** | : | **July 15, 2019** |
| | : | |

## FIRST AMENDED COMPLAINT

### I.    INTRODUCTION

1.    Despite being born with merosin-deficient congenital muscular dystrophy — a neuromuscular disease that over time has dramatically constrained her movement and ultimately required her to use a wheelchair for transportation — Dr. Cindy R. Miller attended medical school, became a Board-certified radiologist, and earned positions as a member of the medical faculties at first Duke University and then Yale University.

2.    Dr. T. Rob Goodman and Dr. Thomas Balcezak have been trying to take all that away.  First, in 2014, after Dr. Goodman became Interim Chairman of Yale's Radiology Department, he discontinued the accommodation Dr. Miller had arranged to allow her to use the restroom during the workday.  Then, in 2017, he administered a review of Dr. Miller's clinical competence that, with Dr. Balcezak's concurrence, resulted in the wrongful revocation of her privileges.  This review violated Yale's internal procedures and breached Dr. Goodman's own

promise that a predetermined performance level — which Dr. Miller achieved — would result in the reinstatement of her privileges.

3.      Drs. Goodman and Balcezak are and at all relevant times were agents of all Defendants in this case, and the Defendants' collective inequitable treatment of Dr. Miller and their repeated refusal to provide her with reasonable accommodations demonstrate bias against Dr. Miller on the basis of her disability.

4.      Accordingly, Dr. Miller brings claims for disability discrimination and retaliation, in violation of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 *et seq.*; and the Connecticut Fair Employment Practices Act (CFEPA), Conn. Gen. Stat. § 46a-60.

5.      Dr. Miller also sues for breach of contract and promissory estoppel on the basis of Dr. Goodman's breach of his 2017 promise that Dr. Miller would be returned to active clinical practice if an external review demonstrated an error rate of less than 5%, which it did.

6.      Dr. Miller demands a jury trial on all claims so triable.

## II.   JURISDICTION AND VENUE

7.      The Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331.

8.      Venue is proper in this District under 28 U.S.C. § 1391(b)(2), because the events or omissions giving rise to the asserted claims occurred herein.

9.      This Court has supplemental jurisdiction over the plaintiff's state law claims, pursuant to 28 U.S.C. § 1367, because they form part of the same case or controversy as the federal law claims.

## III.   PARTIES

10.     The plaintiff, Cindy R. Miller, M.D., resides in New Haven, Connecticut.

11.     Dr. Miller is a person with a disability within the meaning of the ADA and the CFEPA insofar as she has congenital muscular dystrophy with merosin deficiency, which requires her to use a wheelchair to move about and to have assistance to perform a number of activities of daily living, including bathing and dressing.

12.     At all times discussed herein, all defendants were aware of Dr. Miller's disability.

13.     At all times discussed herein, Dr. Miller could perform the essential functions of her employment position with or without reasonable accommodation.

14.     Defendant Yale University ("Yale" or "the University") is a non-profit educational institution located in New Haven, Connecticut.

15.     At all relevant times discussed herein, Yale was Dr. Miller's employer within the meaning of the ADA and the CFEPA.

16.     Yale employs more than 15 employees.

17.     Defendant Yale-New Haven Health Services Corporation does business as Yale-New Haven Health System ("YNHHS").  It is a conglomerate of non-profit healthcare institutions with its headquarters in New Haven, Connecticut.

18.     At all relevant times discussed herein, YNHHS was Dr. Miller's employer within the meaning of the ADA and the CFEPA.

19.     YNHHS employs more than 15 employees.

20.     Defendant Yale-New Haven Hospital ("YNHH" or "the Hospital") is a non-profit healthcare institution located in New Haven, Connecticut.

21.     At all times discussed herein, YNHH was Dr. Miller's employer within the meaning of the ADA and the CFEPA.

22.     YNHH employs more than 15 employees.

23.     YNHH is a subsidiary of YNHHS.

24.     YNHHS exercises control over the actions of YNHH.

25.     At all relevant times discussed herein, Yale, YNHHS, and YNHH were Dr. Miller's single and/or joint employer within the meaning of the ADA and the CFEPA.

26.     Alternatively, at all relevant times discussed herein, YNHHS and YNHH were third parties that aided, abetted, and/or facilitated the actions of Dr. Miller's employer, Yale University.

## IV.    EXHAUSTION OF ADMINISTRATIVE REMEDIES

27.     The plaintiff filed a complaint with the Connecticut Commission on Human Rights and Opportunities ("CHRO") alleging disability discrimination and aiding and abetting said discrimination.  The complaint was dual filed with the federal Equal Employment Opportunity Commission ("EEOC").

28.     The CHRO complaint was filed in a timely manner insofar as it was filed within 180 days of the defendants' last discriminatory acts against the plaintiff.

29.     The plaintiff received Releases of Jurisdiction from the CHRO, dated August 24, 2018.

30.     The plaintiff filed this Complaint within 90 days of her receipt of the Releases of Jurisdiction from the CHRO.

## IV.    STATEMENT OF FACTS

### A.    Dr. Miller Overcomes Tremendous Obstacles to Reach the Pinnacle of Her Profession.

31.     Cindy Miller is a medical doctor and an Associate Professor of Radiology and Biomedical Imaging at the Yale School of Medicine.  She started working for Yale in 2001.

32.     Prior to her employment at Yale, Dr. Miller was an Assistant Professor of Radiology at Duke University Medical Center from 1991 to 2001.

33.     She has been certified by the American Board of Radiology since 1990.  She is also certified in the subspecialty of Pediatric Radiology.  She received a Certificate of Added Qualification (CAQ) in Pediatric Radiology the first year it was offered (1995) and subsequently has received Maintenance of Certification (MOC) for two consecutive ten-year periods.

34.     Dr. Miller's appointment at Yale is in the Department of Radiology and Biomedical Imaging ("the Department"), which has approximately 70 clinical faculty.  As part of her faculty appointment, Dr. Miller is involved in the training of medical students, residents, and fellows.

35.     Dr. Miller's faculty appointment also includes clinical practice at YNHH, where she has read and analyzed imaging studies of patients since coming to Yale in 2001.

36.     YNHH and/or YNHHS control Dr. Miller's clinical work at YNHH and act as her employer with respect to her work at YNHH.

37.     Yale recruited Dr. Miller to be its Section Chief for Pediatric Radiology.  She served in that position until approximately 2007, when her practice shifted to focus on adult thoracic (or chest) radiology.

**B.     Yale Rescinds a Reasonable Accommodation Regarding Restroom Use, Leaving Dr. Miller Unable to Use the Restroom During the Workday.**

38.     When Dr. Miller started working at Yale, she was ambulatory in her home and did not require any special assistance to use the restroom.  However, in September 2003, approximately 1.5 years after she moved to New Haven and joined Yale, she fractured her femur. After the fracture, she could not walk at all, and she needed assistance to use the restroom.

39.     At that time, which was approximately 2004, the Chairman of the Department was James A. Brink.

40.     Dr. Brink arranged for a small group of volunteers in the Department to provide Dr. Miller with help to use the restroom.  The primary volunteer was the Chairman's administrative assistant.  Dr. Miller never called the volunteers more than once per day and rarely more than twice per week.  Each trip required less than 15 minutes of assistance.

41.     That arrangement persisted for approximately nine years.

42.     In approximately 2013, T. Rob Goodman, M.D., became the Interim Chairman of the Department.

43.     Thereafter, in March 2014, Dr. Goodman and the Department's human resources professional told Dr. Miller that staff in the Department were prohibited from providing her with voluntary assistance.

44.     A few months later, in July 2014, Dr. Goodman told Dr. Miller that Yale's counsel mandated that he put her on leave until she could come up with an acceptable plan to use the restroom.

45.     Dr. Miller proposed several solutions, but Dr. Goodman rejected all of them. Eventually, Dr. Miller suggested that she could call her own personal assistant, who normally assisted her at home, to meet her at work when necessary.  Dr. Goodman agreed to this proposal, but he insisted on the condition that the assistant never be further than 20 minutes away.

46.     This "solution" was not workable.  As a result, there were many workdays where Dr. Miller was uncomfortable because she could not use the restroom when necessary and had to wait until she got home at the end of the day to relieve herself.

47.     In or about April 2015, Jeff Geschwind became Chairman of the Department.

6

48.     Several months later, in an open meeting of the Department's female faculty, Dr. Geschwind stated he would not tolerate discrimination.

49.     Dr. Miller took this as a sign that she could consult him regarding her situation, and she approached him with her problem about using the restroom.  Dr. Geschwind stated that the inability to have assistance on site was inhuman and promised to find a way to furnish help.

50.     In March 2016, Dr. Geschwind told Dr. Miller that he had arranged for his administrative assistant — who had previously been her primary helper — to be allowed to assist her once again.  He added the caveat that when that person was unavailable — for example, on her days off — there would be no one else to assist Dr. Miller.

51.     In May 2017, on one specific occasion, Dr. Miller had to use the restroom and could not reach the designated assistant.  Another staff member agreed to look for help, and she returned with two nurses, who seemed happy to provide assistance.  They said Dr. Miller could contact them anytime.

52.     By May 2017, however, Dr. Geschwind had left Yale, and Dr. Goodman was again serving as Interim Chairman.

53.     That same month, May 2017, Dr. Miller was placed on paid administrative leave from Yale.

54.     When she was put on leave, Dr. Miller informed Dr. Goodman that she planned to come to her office each workday to work on a project for which she had received Institutional Review Board approval, a project on which she was collaborating with a hematologist.

55.     Dr. Goodman told Dr. Miller that it would be inadvisable for her to use her office because "you will not be able to receive your care."

56.     Dr. Miller understood Dr. Goodman to be saying that she would not be entitled to ask for assistance with the restroom now that she had been placed on leave.

57.     For the remainder of 2017, Dr. Goodman continued to refuse to provide Dr. Miller with a reasonable accommodation to use the restroom.

### C.     Yale, YNHHS, and/or YNHH Revoke Dr. Miller's Clinical Privileges Without Justification and in Violation of Their Contract with Dr. Miller and Their Clear and Unequivocal Promises to Her.

58.     Over the course of Dr. Miller's approximately 17-year career with Yale, her job performance has been consistent.  She has received many compliments from colleagues; her evaluations from residents have been excellent; no malpractice claims have been made against her; and her error rate on the reading of x-rays (or plain films) has been as good as or better than her colleagues' — that is, less than 5%.

59.     Dr. Miller accomplished this low error rate while maintaining high productivity, consistently interpreting as many films as her most productive colleagues.

60.     Dr. Miller has received other positive recognition for her work.  She received two resident teaching awards in her first three years at Yale.  In 2012, she was recognized as the Mentor of the Year.  And in 2007, she received an award for outstanding teaching from the Society of Pediatric Radiology.  This award is given to only one person in the country each year.

61.     Since approximately 2007, Dr. Miller has focused her practice on adult thoracic radiology.  In those 10-plus years, she has not received any formal performance evaluations.

62.     From 2001 until approximately March 2017, Dr. Miller's duties at Yale and YNHH had included the interpretation and analysis of plain films and CT scans.

63.     In late March 2017, the new Chief of the Thoracic Imaging section, Dr. Isabel Oliva Cortopassi, told Dr. Miller that certain missed findings in her CT scan readings were

prompting YNHH to revoke her authority to read CTs, until a remediation process could be established.

64.     No remediation process was ever established.

65.     After YNHH reassigned Dr. Miller to reading plain films only, she spent approximately five weeks reading only plain films.  During that time, her error rate was negligible.

66.     Nonetheless, on or about May 5, 2017, Yale placed Dr. Miller on paid administrative leave, pending an external review of her work.

67.     Dr. Miller had the authority to file an internal appeal of the decision to place her on administrative leave and to file a legal or administrative complaint concerning the decision.

68.     On or about June 26, 2017, Dr. Goodman met with Dr. Miller and her father, Jay Miller, concerning the administrative leave.

69.     At the meeting, Dr. Goodman stated unequivocally that Dr. Miller's clinical privileges would be reinstated and she would be able to return to active clinical work if she permitted the external review and the external review revealed an error rate of less than 5%.  If the error rate were 5% or greater, or if she contested the external review, remediation would be necessary.

70.     Dr. Goodman made his statement as an offer to Dr. Miller that, if she allowed the external review and did not appeal or challenge her placement on administrative leave during the pendency of the review, then: (1) if the review revealed a weighted error rate of less than 5% on both plain films and CT scans, her full clinical privileges would be reinstated; and (2) if the review revealed an error rate of less than 5% on either plain films or CT scans, her privileges to read those studies would be reinstated while she remediated in the other area.

71.     Dr. Goodman implied that Dr. Miller could accept the contractual offer by performing her end of the bargain.

72.     Dr. Miller clearly, unambiguously, and unequivocally accepted Dr. Goodman's offer, thus forming a unilateral contract, by foregoing her opportunity to appeal or challenge her placement on administrative leave pending the completion of the external review and by not contesting the external review during its pendency.

73.     Dr. Miller intended her forbearance to constitute acceptance of Dr. Goodman's offer to form a unilateral contract.

74.     Dr. Miller's forbearance constituted consideration for her unilateral contract with the Defendants.

75.     Separate from and in addition to his offer to form a contract with Dr. Miller, Dr. Goodman's statement concerning the reinstatement of Dr. Miller's privileges constituted a clear and unequivocal promise.

76.     On the basis of Dr. Goodman's promise, Dr. Miller forewent her opportunity to appeal or challenge her placement on administrative leave pending the completion of the external review.

77.     Upon information and belief, external testing was completed at the Mayo Clinic in Minnesota.  The review took approximately four months and involved approximately 50 plain films and 40 CT scans.

78.     The external review showed that Dr. Miller's error rate for plain films was 4%, which is within a normal range.

79.     The external review also showed that Dr. Miller's weighted error rate for all of her readings was below 5%.  Specifically, because Mayo found an error rate of 4% on plain films

and 12% on CT scans, and because 90% of Dr. Miller's readings were of plain films, her

weighted error rate for all readings was 4.8%.

80.    Upon information and belief, Yale received the results of the external review in

mid-September 2017.

81.    However, Dr. Goodman did not reinstate Dr. Miller's clinical privileges.

82.    Based on Dr. Goodman's contract with Dr. Miller and his promise to her, she

should have been reinstated with full privileges based on the results of the Mayo review.

83.    At a minimum, Dr. Miller should have been given the reasonable accommodation

of reading only plain films, for which her error rates (according to Mayo) was only 4%.

84.    Instead, Dr. Goodman told Dr. Miller that the Mayo Clinic findings would be

discussed by the YNHH Institutional Practice Quality and Peer Review Committee (IPQPRC).

85.    Dr. Goodman next informed Dr. Miller that the IPQPRC recommended that she

only be allowed to read inpatient plain films pending neuropsychological testing.

86.    As it happened, Dr. Miller had recently undergone neuropsychological testing at

Massachusetts General Hospital (MGH) in September 2017.

87.    The psychologist who administered the neuropsychological testing at

Massachusetts General Hospital (MGH) in September 2017 concluded that the tests did not show

any reason why Dr. Miller could not continue to function as a radiologist.

88.    Dr. Miller told Dr. Goodman about the existing testing.  He replied that the MGH

results would have to be evaluated by Yale's in-house psychologist, Keith Hawkins, so

Dr. Miller gave permission for the psychologist at MGH who had administered the test to speak

directly with Dr. Hawkins.

89.     To Dr. Miller's knowledge, Dr. Hawkins did not conduct an accurate or valid assessment of her radiology skills, as the Mayo Clinic had done.

90.     Dr. Hawkins's conclusions also contradicted the recent report of testing administered by Dr. Miller's doctor at MGH.

91.     Dr. Miller gave Dr. Hawkins permission to speak with Dr. Goodman and Thomas Balcezak, the Chief Medical Officer for YNHH and YNHHS, concerning the MGH testing.

92.     Approximately one and a half weeks later, on or about October 19, 2017, Dr. Miller met with Drs. Goodman and Balcezak.  Dr. Balcezak said that Dr. Miller had a "defect," as demonstrated by the neuropsychological testing, and that her "defect" made it impossible for her to practice diagnostic radiology.

93.     A motivating factor in Dr. Balcezak's statement was Dr. Miller's disability.

94.     From that point forward, YNHHS's and YNHH's position has been that Dr. Miller cannot practice any form of diagnostic radiology.

95.     YNHHS's and YNHH's review process did not comply with the Medical Staff Policy and was not consistent with other internal reviews.

96.     Thereafter, on or about November 1, 2017, Dr. Goodman told Dr. Miller that, in order to continue working, she would have to sign a "refer and follow" form.  The form stated that Dr. Miller was "not clinically active in the Hospital inpatient or outpatient setting," and it prohibited her from serving as an Attending physician at YNHH or from "direct[ing] the care of [her] patients when hospitalized."

97.     Signing the form effectively would prevent Dr. Miller from practicing medicine and would limit her to non-clinical assignments.

98.     Dr. Goodman also told Dr. Miller that her salary would be reduced from approximately $350,000 per year to less than $70,000 per year.

99.     When Dr. Miller mentioned the possibility of "taking disability" instead, Dr. Goodman immediately sent her via email the name and number of the contact for disability insurance, as if he had planned to discuss it with her.

100.    A motivating factor in Dr. Goodman's ultimatum regarding the "refer and follow" form was Dr. Miller's disability.

101.    Dr. Miller refused to sign the form.

102.    As a result, YNHH and YNHHS have refused to continue Dr. Miller's clinical privileges, and her clinical privileges have expired.

103.    On February 23, 2018, Yale informed Dr. Miller that it was reducing her salary on the basis of the removal of her clinical privileges.  Yale did reduce her salary.

104.    Upon information and belief, Yale, YNHHS, and YNHH are all responsible for paying Dr. Miller's salary.

105.    Yale, YNHHS, and YNHH have denied Dr. Miller the reasonable accommodation of reading only plain films.  That denial continues to the present.

D.      **Dr. Miller Files an Administrative Complaint, and Yale Retaliates by Further Reducing Her Salary.**

106.    As previously explained, Dr. Miller filed a CHRO and EEOC complaint against Yale.

107.    Yale received notice of the Complaint on or about April 30, 2018, at the latest.

108.    The Complaint described Dr. Miller's claims for disability discrimination, including the denial of reasonable accommodations, in violation of federal and Connecticut law.

13

109.     Prior to the filing of the Complaint, on February 23, 2018, Yale informed Dr. Miller that it was reducing her salary on the basis of the removal of her clinical privileges. Yale did reduce her salary by approximately $50,000.

110.     By February 2018, Dr. Miller had already been without clinical privileges for approximately two months.

111.     Following the filing of the Complaint, Dr. Miller received a letter from Dr. Goodman dated May 11, 2018.  In the letter, Dr. Goodman said that Dr. Miller's salary would be reduced more significantly.  Starting July 1, 2018, it would be reduced by approximately $150,000, and starting July 1, 2019, it would be reduced by another approximately $82,500.

112.     On or about July 1, 2018, Dr. Miller's salary was reduced by approximately $150,000.

113.     Yale reduced Dr. Miller's salary in retaliation for her exercise of rights protected by federal and Connecticut law.

**V.     LEGAL CLAIMS**

**FIRST CLAIM FOR RELIEF:
DISABILITY DISCRIMINATION,
IN VIOLATION OF THE AMERICANS WITH DISABILITIES ACT,
42 U.S.C. § 12112,
as to YALE UNIVERSITY**

114.     The Plaintiff incorporates by reference all preceding allegations in this Complaint as if fully pled in this Count.

115.     Yale University discriminated against Dr. Miller in the terms, conditions, and privileges of her employment on the basis of her disability, including by failing to provide one or more reasonable accommodations and by reducing her compensation.

14

116.    Yale's conduct in this regard was willful and/or in reckless disregard to Dr. Miller's right to be free from discrimination.

117.    As a result of Yale's conduct, Dr. Miller suffered damages.

**SECOND CLAIM FOR RELIEF:**
**DISABILITY DISCRIMINATION,**
**IN VIOLATION OF THE CONNECTICUT FAIR EMPLOYMENT PRACTICES ACT,**
**CONN. GEN. STAT. § 46a-60(b)(1),**
**as to YALE UNIVERSITY**

118.    The Plaintiff incorporates by reference all preceding allegations in this Complaint as if fully pled in this Count.

119.    Yale University discriminated against Dr. Miller in the terms, conditions, and privileges of her employment, in that her disability contributed to or played a part in one or more adverse actions, including failing to provide her with one or more reasonable accommodations and reducing her compensation.

120.    As a result of Yale's conduct, Dr. Miller suffered damages.

**THIRD CLAIM FOR RELIEF:**
**DISABILITY DISCRIMINATION,**
**IN VIOLATION OF THE AMERICANS WITH DISABILITIES ACT,**
**42 U.S.C. § 12112,**
**as to YALE-NEW HAVEN HEALTH SERVICES CORPORATION**

121.    The Plaintiff incorporates by reference all preceding allegations in this Complaint as if fully pled in this Count.

122.    Yale-New Haven Health Services Corporation discriminated against Dr. Miller in the terms, conditions, and privileges of her employment on the basis of her disability, including by failing to provide one or more reasonable accommodations and by reducing her compensation.

123.     YNHHS's conduct in this regard was willful and/or in reckless disregard to Dr. Miller's right to be free from discrimination.

124.     As a result of YNHHS's conduct, Dr. Miller suffered damages.

**FOURTH CLAIM FOR RELIEF:**
**DISABILITY DISCRIMINATION,**
**IN VIOLATION OF THE CONNECTICUT FAIR EMPLOYMENT PRACTICES ACT,**
**CONN. GEN. STAT. § 46a-60(b)(1),**
**as to YALE-NEW HAVEN HEALTH SERVICES CORPORATION**

125.     The Plaintiff incorporates by reference all preceding allegations in this Complaint as if fully pled in this Count.

126.     Yale-New Haven Health Services Corporation discriminated against Dr. Miller in the terms, conditions, and privileges of her employment, in that her disability contributed to or played a part in one or more adverse actions, including failing to provide her with one or more reasonable accommodations and reducing her compensation.

127.     As a result of YNHHS's conduct, Dr. Miller suffered damages.

**FIFTH CLAIM FOR RELIEF:**
**DISABILITY DISCRIMINATION,**
**IN VIOLATION OF THE AMERICANS WITH DISABILITIES ACT,**
**42 U.S.C. § 12112,**
**as to YALE-NEW HAVEN HOSPITAL**

128.     The Plaintiff incorporates by reference all preceding allegations in this Complaint as if fully pled in this Count.

129.     Yale-New Haven Hospital discriminated against Dr. Miller in the terms, conditions, and privileges of her employment, in that her disability contributed to or played a part in one or more adverse actions, including failing to provide her with one or more reasonable accommodations and reducing her compensation.

130.    YNHH's conduct in this regard was willful and/or in reckless disregard to Dr. Miller's right to be free from discrimination.

131.    As a result of YNHH's conduct, Dr. Miller suffered damages.

**SIXTH CLAIM FOR RELIEF:**
**DISABILITY DISCRIMINATION,**
**IN VIOLATION OF THE CONNECTICUT FAIR EMPLOYMENT PRACTICES ACT,**
**CONN. GEN. STAT. § 46a-60(b)(1),**
**as to YALE-NEW HAVEN HOSPITAL**

132.    The Plaintiff incorporates by reference all preceding allegations in this Complaint as if fully pled in this Count.

133.    Yale-New Haven Hospital discriminated against Dr. Miller in the terms, conditions, and privileges of her employment on the basis of her disability, including by failing to provide one or more reasonable accommodations and by reducing her compensation.

134.    As a result of YNHH's conduct, Dr. Miller suffered damages.

**SEVENTH CLAIM FOR RELIEF:**
**IN THE ALTERNATIVE – AIDING AND/OR ABETTING DISCRIMINATION,**
**IN VIOLATION OF THE CONNECTICUT FAIR EMPLOYMENT PRACTICES ACT,**
**CONN. GEN. STAT. § 46a-60(b)(5),**
**as to YALE-NEW HAVEN HEALTH SERVICES CORPORATION**

135.    The Plaintiff incorporates by reference all preceding allegations in this Complaint as if fully pled in this Count.

136.    In the alternative, if Yale-New Haven Health Services Corporation was not Dr. Miller's employer, then YNHHS aided, abetted, incited, compelled, and/or coerced one or more acts by Dr. Miller's employer, Yale University, that constituted discriminatory employment practices, as defined by § 46a-60(b) of the Connecticut General Statutes.

137.    As a result of YNHHS's conduct, Dr. Miller suffered damages.

## EIGHTH CLAIM FOR RELIEF:
## IN THE ALTERNATIVE – AIDING AND/OR ABETTING DISCRIMINATION,
## IN VIOLATION OF THE CONNECTICUT FAIR EMPLOYMENT PRACTICES ACT,
## CONN. GEN. STAT. § 46a-60(b)(5),
## as to YALE-NEW HAVEN HOSPITAL

138.    The Plaintiff incorporates by reference all preceding allegations in this Complaint as if fully pled in this Count.

139.    In the alternative, if Yale-New Haven Hospital was not Dr. Miller's employer, then YNHH aided, abetted, incited, compelled, and/or coerced one or more acts by Dr. Miller's employer, Yale University, that constituted discriminatory employment practices, as defined by § 46a-60(b) of the Connecticut General Statutes.

140.    As a result of YNHH's conduct, Dr. Miller suffered damages.

## NINTH CLAIM FOR RELIEF:
## RETALIATION,
## IN VIOLATION OF THE AMERICANS WITH DISABILITIES ACT,
## 42 U.S.C. § 12203,
## as to YALE UNIVERSITY

141.    The Plaintiff incorporates by reference all preceding allegations in this Complaint as if fully pled in this Count.

142.    Yale University retaliated against Dr. Miller because she opposed discrimination against her on the basis of her disability.

143.    Yale's conduct in this regard was willful and/or in reckless disregard to Dr. Miller's right to be free from retaliation.

144.    As a result of Yale's conduct, Dr. Miller suffered damages.

## TENTH CLAIM FOR RELIEF:
## RETALIATION,
## IN VIOLATION OF THE CONNECTICUT FAIR EMPLOYMENT PRACTICES ACT,
## CONN. GEN. STAT. § 46a-60(b)(4),
## as to YALE UNIVERSITY

145.     The Plaintiff incorporates by reference all preceding allegations in this Complaint as if fully pled in this Count.

146.     Yale University retaliated against Dr. Miller because she opposed discrimination against her on the basis of her disability.

147.     As a result of Yale's conduct, Dr. Miller suffered damages.

## ELEVENTH CLAIM FOR RELIEF:
## BREACH OF CONTRACT,
## as to YALE UNIVERSITY

148.     The Plaintiff incorporates by reference all preceding allegations in this Complaint as if fully pled in this Count.

149.     On or about June 26, 2017, Dr. Miller entered into an express or implied unilateral oral contract with Dr. Goodman.

150.     In entering into a contract with Dr. Miller, Dr. Goodman was acting with the actual or apparent authority of Yale University, Yale-New Haven Health Services Corporation, and Yale-New Haven Hospital, such that each Defendant was bound by the contract.

151.     Dr. Goodman, acting on behalf of all Defendants, breached the contract by failing or refusing to reinstate Dr. Miller's clinical privileges and to return her to active clinical work when the external review revealed a weighted error rate of less than 5%.

152.     As a result of the Defendants' breach, Dr. Miller has suffered and will continue to suffer damages.

**TWELFTH CLAIM FOR RELIEF:**
**PROMISSORY ESTOPPEL,**
**as to YALE UNIVERSITY**

153.    The Plaintiff incorporates by reference all preceding allegations in this Complaint as if fully pled in this Count.

154.    On or about June 26, 2017, Dr. Goodman made a clear and definite promise to Dr. Miller concerning the reinstatement of her clinical privileges based on the external review of her performance.

155.    In making that promise, Dr. Goodman was acting with the actual or apparent authority of Yale University, Yale-New Haven Health Services Corporation, and Yale-New Haven Hospital.

156.    Dr. Goodman could and did reasonably expect that Dr. Miller would detrimentally rely on his promise, which she did.

157.    Dr. Goodman did not act in accordance with his promise.

158.    The enforcement of Dr. Goodman's promise is necessary to avoid injustice.

**THIRTEENTH CLAIM FOR RELIEF:**
**BREACH OF CONTRACT,**
**as to YALE-NEW HAVEN HEALTH SERVICES CORPORATION**

159.    The Plaintiff incorporates by reference all preceding allegations in this Complaint as if fully pled in this Count.

160.    On or about June 26, 2017, Dr. Miller entered into an express or implied unilateral oral contract with Dr. Goodman.

161.    In entering into a contract with Dr. Miller, Dr. Goodman was acting with the actual or apparent authority of Yale University, Yale-New Haven Health Services Corporation, and Yale-New Haven Hospital, such that each Defendant was bound by the contract.

162.    Dr. Goodman, acting on behalf of all Defendants, breached the contract by failing or refusing to reinstate Dr. Miller's clinical privileges and to return her to active clinical work when the external review revealed a weighted error rate of less than 5%.

163.    As a result of the Defendants' breach, Dr. Miller has suffered and will continue to suffer damages.

### FOURTEENTH CLAIM FOR RELIEF:
### PROMISSORY ESTOPPEL,
### as to YALE-NEW HAVEN HEALTH SERVICES CORPORATION

164.    The Plaintiff incorporates by reference all preceding allegations in this Complaint as if fully pled in this Count.

165.    On or about June 26, 2017, Dr. Goodman made a clear and definite promise to Dr. Miller concerning the reinstatement of her clinical privileges based on the external review of her performance.

166.    In making that promise, Dr. Goodman was acting with the actual or apparent authority of Yale University, Yale-New Haven Health Services Corporation, and Yale-New Haven Hospital.

167.    Dr. Goodman could and did reasonably expect that Dr. Miller would detrimentally rely on his promise, which she did.

168.    Dr. Goodman did not act in accordance with his promise.

169.    The enforcement of Dr. Goodman's promise is necessary to avoid injustice.

### FIFTEENTH CLAIM FOR RELIEF:
### BREACH OF CONTRACT,
### as to YALE-NEW HAVEN HOSPITAL

170.    The Plaintiff incorporates by reference all preceding allegations in this Complaint as if fully pled in this Count.

171.    On or about June 26, 2017, Dr. Miller entered into an express or implied unilateral oral contract with Dr. Goodman.

172.    In entering into a contract with Dr. Miller, Dr. Goodman was acting with the actual or apparent authority of Yale University, Yale-New Haven Health Services Corporation, and Yale-New Haven Hospital, such that each Defendant was bound by the contract.

173.    Dr. Goodman, acting on behalf of all Defendants, breached the contract by failing or refusing to reinstate Dr. Miller's clinical privileges and to return her to active clinical work when the external review revealed a weighted error rate of less than 5%.

174.    As a result of the Defendants' breach, Dr. Miller has suffered and will continue to suffer damages.

**SIXTEENTH CLAIM FOR RELIEF:**
**PROMISSORY ESTOPPEL,**
**as to YALE-NEW HAVEN HOSPITAL**

175.    The Plaintiff incorporates by reference all preceding allegations in this Complaint as if fully pled in this Count.

176.    On or about June 26, 2017, Dr. Goodman made a clear and definite promise to Dr. Miller concerning the reinstatement of her clinical privileges based on the external review of her performance.

177.    In making that promise, Dr. Goodman was acting with the actual or apparent authority of Yale University, Yale-New Haven Health Services Corporation, and Yale-New Haven Hospital.

178.    Dr. Goodman could and did reasonably expect that Dr. Miller would detrimentally rely on his promise, which she did.

179.    Dr. Goodman did not act in accordance with his promise.

180.     The enforcement of Dr. Goodman's promise is necessary to avoid injustice.

\* \* \*

WHEREFORE, the Plaintiff respectfully prays that this Court award the following damages, jointly and severally, from each Defendant:

a.     Back pay damages;

b.     Reinstatement or, in the alternative, front pay damages;

c.     Compensatory damages;

d.     Punitive damages for the Defendants' willful and/or recklessly indifferent conduct, pursuant to 42 U.S.C. § 1981a;

e.     Expectation damages;

f.     Reliance damages;

g.     Consequential damages;

h.     Interest, calculated at up to 10% simple interest per year, pursuant to Conn. Gen. Stat. § 37-3a;

i.     Enforcement of Dr. Goodman's promise to the extent necessary to avoid injustice;

j.     Attorneys' fees and costs; and

k.     Any other remedy that may appear to be just and proper.

**RESPECTFULLY SUBMITTED,
THE PLAINTIFF**

By:     */s/ Joshua R. Goodbaum*
          Joseph D. Garrison (*ct04132*)
          Joshua R. Goodbaum (*ct28834*)
          GARRISON, LEVIN-EPSTEIN, FITZGERALD
                & PIRROTTI, P.C.
          405 Orange Street
          New Haven, Connecticut  06511
          Tel.:  (203) 777-4425
          Fax:  (203) 776-3965
          jgarrison@garrisonlaw.com
          jgoodbaum@garrisonlaw.com

23

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that, on the above-stated day, a copy of the foregoing was filed electronically *[and served by mail on anyone unable to accept electronic filing]*.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system *[or by mail to anyone unable to accept electronic filing]*.  Parties may access this filing through the Court's system.

*/s/ Joshua R. Goodbaum*
Joshua R. Goodbaum